Louise AMERINE, Appellant,

v.

Tom R. HUNTER et al., Appellees.

No. 10755.

Court of Civil Appeals of Texas.

Austin.

April 20, 1960.

Rehearing Denied May 11, 1960.

Clyde Vinson, Thigpin & Steib, San Angelo, for appellant.

Snodgrass, Smith & Rose, San Angelo, for appellees.

GRAY, Justice.

This is a malpractice suit brought by appellant, Mrs. Louise Amerine, against appellee, Dr. Tom R. Hunter, and others to recover damages resulting to appellant from the removal of a tumor from her right armpit.

Appellant alleged that appellee diagnosed a growth in her right armpit as a simple tumor and advised her that the same should be surgically removed; that such removal would be a simple matter which he could perform in his office, and that he promised and assured her that she would suffer no permanent disability but would be able to return to her work in a few days after such surgery. She alleged that she relied on such promises and assurances and consented to the removal of said tumor and that except for such promises and assurances she would not have agreed to such removal. She alleged that the operation was performed by appellee in his office and that he negligently cut and severed the right radial nerve and partially severed the right median and right ulnar nerves and refused to repair or attempt to repair said severed and damaged nerves.

Appellant alleged that prior to the operation she was physically sound and possessed the full use of her right hand and arm and worked as a cashier in cafes and offices and as a waitress; that because of the operation she has lost the use of her right hand and arm and is unable to perform her usual work as a cashier and waitress. She alleged and sued to recover her damages.

Appellee testified that he diagnosed the tumor in appellant's right armpit as an enlarged lymph node about the size of an English walnut and that he advised appellant that she should have the same surgically removed. He said that at that time there were no abnormalities as to the use of appellant's right hand, arm or any of her right extremities and that appellant said she had no pain. He said he told appellant that the tumor could be removed "in the minor operating room there in the office" and was asked and testified:

"Q. How long did you tell her your—what was the prognosis as to how long she would be off from work; what did you tell her about that before you cut into her armpit? A. Again I can't recall any definite word or phrase used at that time in talking with this lady. However, it is a common practice that any patient who comes into my office to want to know ahead of time approximately how long it is going to take them to get well or get back to work; and in this lady's case I did presume in my own mind, thinking this was an enlargement of the lymph node, that it would take approximately a week for it to heal sufficiently to remove sutures and for her eventually to be able to return to work.

"Q. And that is what you told her, isn't it, doctor? A. I am sure that I probably did. I don't remember exactly, but I say I probably did. That is a common practice."

The operation was performed in appellee's office and he said that he first learned that the tumor was something other than a lymph node when the tumor itself was exposed in the process of the operation and that he then knew that it was a tumor involving the nerve trunk; that he called for a second nurse before proceeding with dissection. He said that when he discov-

ered that the nerves were involved he talked to appellant and said:

"A. I will start again on what I told her, as I remember it. I told Mrs. Amerine that this was a large tumor within a nerve trunk, the nerve was the one that went to her wrist; that it wasn't possible to remove it without cutting or injuring some of the fibers and if it was removed entirely it would leave her with some weakness of her wrist for a long time; told her also that, whether spontaneously or whether she wanted to know whether it was malignant, I don't remember—that is, conveyed the idea there was a chance or possibility of malignancy being present; also told her I could take a portion of this tumor and have it examined under a microscope, leave it or leave the remainder of the tumor, sew her up or we could remove it completely by dividing these fibers.

"Q. Your testimony was she said go ahead and cut it out, is that right? A. The few words she used that stick in my mind, 'I want it out.'

"Q. Knowing she was going to be crippled in her right hand, wrist, for a long time and you tell the Jury she told you then and there 'I want it out'? A. Knowing she was going to have weakness in her wrist for a long, long time."

Malignancy was not found. Some of the fibers of the radial nerve were severed and appellant has sustained a substantial loss of the use of her right hand and arm.

The jury answered: issue 1, that appellee did not partially "sever" the median and ulnar nerves in appellant's right armpit; issue 4, that appellee did not "cut and sever" the radial nerve in appellant's right armpit, and issue 11, that as a result of the operation appellant suffered injuries to her right hand, wrist and arm. The other special issues were not answered.

The trial court rendered judgment that appellant take nothing by her suit.

Appellant here presents points to the effect that the trial court erred: in failing to include in his definition of a physician's negligence the elements of both diagnosis and treatment; in failing to submit requested issues as to appellee's failure to repair cut nerves; in failing to give requested issues on appellee's refusal to give proper post-operative treatment; in failing to grant a motion for mistrial; in failing to give appellant an opportunity to pass upon the ultimate and controlling issues of fact; in disregarding the jury's answer to issue 11, and in refusing her motion for new trial based on jury misconduct.

Issues 2, 3, 5 and 6 were negligence and proximate cause issues and the jury was instructed to answer them only in the event the preceding issue was answered "yes." Issues 2 and 3 followed issue 1 and issues 5 and 6 followed issue 4. They were not anwered. Issue 7 inquired if appellee "promised and assured" appellant that she would suffer no permanent disability and that she would be able to return to her work within a week after the operation. Issue 8 inquired if appellant relied on such promises and assurances. Issue 9 inquired if appellee's diagnosis of the tumor prior to the operation was negligence. Issue 10 inquired if such negligence was a proximate cause of appellant's injuries. These issues (7, 8, 9 and 10) were not answered. Issues 12a, b, c and d were damage issues and were not answered.

Appellant alleged that appellee was negligent in named acts and that such negligence was a proximate cause of her injuries and damages.

■ By appellant's first point she complains that the trial court failed to include in his definition of a physician's negligence elements of both diagnosis and treatment. In the case here there was no competent evidence to raise either issue and for which reason appellant was not harmed.

In Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779, 782, 13 A.L.R.2d 1, the court said:

"It is definitely settled with us that a patient has no cause of action against his doctor for malpractice, either in diagnosis or recognized treatment, unless he proves by a doctor of the same school of practice as the defendant: ▇ that the diagnosis or treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries." Authorities cited.

Appellee testified that an attempt to repair appellant's nerves would result in further harm to her. There is no competent evidence to the contrary. Appellee also said he did not refuse to give proper post-operative treatment to appellant. There is no competent evidence to the contrary.

What we have just said shows there is no competent evidence to support a jury's answer to issues 9 or 10. Bowles v. Bourdon, supra.

▇ The mere fact that appellant suffered injuries as a result of the operation as found by the jury (issue 11) standing alone would not entitle her to recover damages. Bowles v. Bourdon, supra, as later quoted.

▇ Actually issues 7 and 8 are undisputed issues. However, if appellee did promise appellant that she would suffer no permanent disability from the operation and that she would be able to return to work within a week thereafter there is involved only a question of diagnosis without proof of negligence and proximate cause. The fact that appellant relied on such promises and assurances would not change the result.

What has just been said disposes of appellant's complaint that a mistrial should have been granted because the jury left material issues unanswered.

The record shows that soon after the jury retired to consider the verdict that the jury first requested that they be furnished a dictionary. This request was refused and they then requested that the term "cut and severed" be defined. This request was also refused. Omitting formal parts these requests and the trial court's action thereon are:

"Plaintiff's Exhibit No. L

" 'To fully understand the meaning of words, request the most complete dictionary be made available for our use.'

"Ladies and Gentlemen of the Jury:

"In reply to your question which is hereto attached you are instructed that it is not permissible for the Court to make available a dictionary for your use in answering the questions submitted, neither is it permissible for you to look up the meaning of the words in a dictionary prior to returning your verdict.

"s/ O. L. Parish
"Judge Presiding

"Plaintiff's Exhibit No. 2

" 'Please define cut and severed.'

"Ladies and Gentlemen of the Jury:

"In reply to your question you are instructed that the words 'cut and sever', as used in the charge, are to be given their usual and ordinary meaning.

"s/ O. L. Parish
"Judge Presiding."

The jury received the case in the afternoon on Thursday and they proceeded to discuss the issues together with the meaning of the term "cut and sever" used in issue 4. They then made the requests supra. Thereafter, according to the testimony of some of the jurors, issue 1 was answered, others said issue 1 was not answered until the next morning. However, issue 4 was not then answered, some

of the jurors voting "yes" and some voting "no" on that issue.

The jury was permitted to separate and return to their homes Thursday night. Some of the jurors consulted their dictionaries for the meaning of the words "cut and sever." The next morning upon their return to the jury room the jury proceeded to discuss issue 4, the action of jurors consulting dictionaries was made known to, at least, some of the jurors, and issue 4 was answered "no." The jurors who had voted "yes" the evening before changed their vote to "no." At least one juror said he changed his vote after consulting his dictionary.

Eleven jurors testified at the hearing on the motion for new trial. This testimony establishes the occurrence of the facts above stated.

Findings of fact and conclusions of law were not filed by the trial court.

■ We are mindful that if there was presented a question of fact as to whether misconduct of the jury occurred then the action of the trial court in overruling the motion for new trial based on such alleged misconduct would be conclusive here. However, that is not the case before us because there is no dispute as to the occurrence of misconduct and it becomes a question of law whether probable injury resulted. Rule 327, Texas Rules of Civil Procedure. Barrington v. Duncan, 140 Tex. 510, 169 S.W.2d 462.

■ It is certain that the jurors consulted dictionaries to aid them in answering issue 4, that the same were so used by some of the jurors, and at least one vote was changed by reason thereof. Issue 4 was answered against appellant and unless it can be said from the entire record that harm did not result from such misconduct it becomes our duty to reverse the judgment of the trial court—appellant having discharged her burden of showing harm.

City of Houston v. Quinones, 142 Tex. 282, 177 S.W.2d 259.

Appellant alleged that appellee negligently "cut and severed" her right radial nerve and that such negligence was a proximate cause of her injuries and damage. Her right to recover is dependent on her showing by competent evidence that appellee was negligent in his performance of alleged acts and that such negligence was a proximate cause of her injuries. In Bowles v. Bourdon, supra, the court quoted with approval from Ewing v. Goode, C. C., 78 F. 442, 444 as follows:

"When a case concerns the highly specialized art of treating (disease), with respect to which a layman can have no knowledge at all, the court and jury must be dependent on expert evidence. There can be no other guide, and, where want of skill or attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury. Again, when the burden of proof is on the plaintiff to show that the injury was negligently caused by defendant, it is not enough to show the injury, together with the expert opinion that it might have occurred from negligence and many other causes. Such evidence has no tendency to show that negligence did cause the injury."

Doctors other than appellee were called and testified in the case. We find no evidence in the record, and appellant has not directed us to any, that meets the above requirements. It follows that harm did not result to appellant because of jury misconduct.

The judgment of the trial court is affirmed.

Affirmed.

ARCHER, C. J., dissenting.